Keiser v. Gammon.

---

KEISER *et al.* v. GAMMON *et al., Appellants.*

1. **Evidence :** VALUE OF PROPERTY.   In an action to set aside a sale of land under a deed of trust, on the ground of inadequacy of consideration and misconduct in the sale and fraud in preventing bidding, twenty-two hundred and eleven dollars being the sum realized, evidence that the land in question was sold at a trustee's sale, seventeen months prior for thirteen hundred and ninety-six dollars, at a private sale shortly thereafter for sixteen hundred dollars, that plaintiffs' ancestor purchased the land sixteen months prior to the sale sought to be set aside for seventeen hundred and seventy-one dollars, and that there has been no subsequent increase in its value, is admissible as bearing on the question of value.

2. ——— : ———.   The price at which property sells in the market may ordinarily be taken as evidence of its value.

3. **Trustee's Sale :** FRAUD.   A purchaser, either at a judicial sale or one under a deed of trust, who is guilty of any fraud, trick, or device, the object of which is to obtain the property at less than its value, and succeeds in doing so, will not be permitted to enjoy the fruits of his purchase.

4. ——— : ——— : BURDEN OF PROOF. The burden of proof in such case is on the party attacking the sale, and the evidence offered to establish the fraud must be clear and convincing.

5. ——— : ——— : ———. The evidence in this case reviewed, and held not to meet the requirements of the above rule, and the decree of the circuit court, setting aside the sale and annulling the deed, reversed.

*Appeal from Saline Circuit Court.*—HON. J. P. STROTHER, Judge.

REVERSED.

*Graves & Aull* and *Davis & Willis* for appellants.

(1) The case, as made by respondents, if sustained by evidence, is a resulting trust; and the law governing resulting trusts must determine the rights of these parties. *Jackson v. Wood*, 88 Mo. 77 ; *McNew v. Booth*, 42 Mo. 192: *Faust v. Hass*, 73 Pa. St. 295 ; *Christy v. Sill*, 95 Pa. St. 382 ; 1 Lomax Dig. 200 ; 2 Story's Eq. [12 Ed.] sec. 1265. (2) And as said in *Jackson v. Wood*, *supra*, "before relief can be granted, the fraud must be established by clear and convincing evidence." *Jackson v. Wood*, 88 Mo. 77 ; *Forrester v. Scoville*, 51 Mo. 268 ; *Durkee v. Chambers*, 57 Mo. 581 ; *Morey v. Staley*, 54 Mo. 421 ; *Kennedy v. Kennedy*, 57 Mo. 76 ; *Forrester v. Moore*, 77 Mo. 651 ; *Knowles v. Mercer*, 57 Mo. 76. (3) Hill's unsupported evidence is wholly insufficient to sustain the decree. *Cornet v. Bertelsman*, 61 Mo. 126–7 ; Kerr on Fraud, 384. (4) The evidence shows appellants paid full value for the land at twenty-two hundred and eleven dollars. (5) Upon value the court erroneously excluded deeds showing that this land sold under prior deed of trust for thirteen hundred and ninety-six dollars, one year and seven months before appellants bought, and in same month at private sale for sixteen hundred dollars ; and, again, at private sale, one year and four

months before appellants bought, respondents' ancestor bought same for seventeen hundred and seventy-one dollars ; also the evidence of Tutt, Thomas, and Ewing in connection with these deeds. *Thornton v. Compton*, 18 N. H. 20 ; *State to use v. Schol*, 47 Mo. 84 ; *Britton v. Stanley*, 4 Whart. 114 ; *Kent v. Whiting*, 91 Mass. 63 ; *Croak v. Owens*, 121 Mass. 28 ; *Brigham v. Evans*, 113 Mass. 540 ; *Benham v. Dunbar*, 103 Mass. 365. (6) The decree allowed appellants for improvements a sum far below the amount proved. (7) Respondents' brief claims that nothing should be allowed. But they are estopped. Their petition prays that appellants be allowed for improvements and taxes. The case was tried on that theory. *Lemon v. Chanslor*, 68 Mo. 353.

*John E. Burden* and *W. P. Bradshaw* for respondents.

(1) The fraud of said Wm. T. Gammon, in suppressing competition at said sale, and procuring said lands at less than their cash value vitiates said sale, as to him and his said wife, of whom he was agent. 1 Perry on Trusts [2 Ed.] sec. 172 ; *Massey v. Young*, 73 Mo. 260 ; *Stewart v. Nelson*, 25 Mo. 309 ; *Abbey v. Dewey*, 25 Pa. St. 413 ; *Stewart v. Severance*, 43 Mo. 322 ; *Turner v. Adams*, 46 Mo. 95 ; *Miltenberger v. Morrison*, 39 Mo. 71 ; *Wagner v. Pellips*, 51 Mo. 117 ; *Durfee v. Moran*, 57 Mo. 374 ; *Wooton v. Hinkle*, 20 Mo. 290. (2) The conduct of Tutt, the trustee, was sufficient to vitiate the sale. He could not bid at the sale for appellants. Besides, he sold at an unusual hour and arranged with appellants to loan them fifteen hundred dollars of the purchase money of said lands, before said sale, for which he and his son received one per cent. commission. *Hull v. Voorheis*, 45 Mo. 555 ; *Michaud v. Girod*, 4 How. 552 ; *Neal v. Slone*, 20 Mo. 294 ; *Stoffel v. Schroedér*, 62 Mo. 147. The trustee bid in the property himself.

for less than what he told parties he was offered for it. *Meyer v. Ins. Co.*, 5 Mo. App. 245 ; *Neal v. Stone*, 20 Mo. 294. Sale of part of premises would have been sufficient to pay the debt. *Tatum v. Halliday*, 59 Mo. 422 ; *Chesley v. Chesley*, 49 Mo. 540 ; *Stewart v. Nelson*, 25 Mo. 309. (3) The respondents are not estopped by reason of any improvements made on said lands because three of them, to-wit : Charles Alex., Virgie, and Forest Keiser, were minors up to the time and after the time of the commencement of this suit, and none of said respondents had any knowledge of the fraudulent acts of appellants at the time said improvements were being put upon said premises. *Tatum v. Halliday*, 59 Mo. 422 ; *Henrioid v. Neusbaumer*, 69 Mo. 46. (4) The appellants having procured said lands by fraud are entitled to no compensation for improvements. " It is only a *bona-fide* occupant of land who is allowed to mitigate the damages by offsetting the value of his improvements to the extent of rents and profits claimed." *See v. Bowman*, 55 Mo. 400 ; *Woodhull v. Rosenthal*, 61 N. Y. 396 ; *New Orleans v. Gaines*, 15 Wall. 624 ; *Allen v. Berry*, 50 Mo. 90 ; *Dothage v. Stewart*, 35 Mo. 251 ; *Barlow v. Bell*, 10 Am. Dec. 731. (5) The court did not err in excluding evidence of former sales of this land, and the state of the market, as offered by respondents. *Tate v. Railroad*, 64 Mo. 153, and cases cited ; *Railroad v. Patterson*, 19 Rep. 408, and cases cited ; *Crum v. Holman*, 19 Ind. 30-37 ; *McCracken v. West*, 17 Ohio, 24 ; *Railroad v. Benson*, 36 N. J. Law, 554. (6) The court did not err in admitting the statements of Powell and Adams as to what the trustee told them. *Meyer v. Ins. Co.*, 5 Mo. App. 245.

NORTON, C. J.—On the twenty-eighth of February, 1878, William, the father and ancestor of the plaintiffs in this suit, executed and delivered to one John A. S. Tutt, as trustee, a deed of trust conveying certain lands

specifically described as containing two hundred acres, more or less, to secure the payment of a certain note for fifteen hundred and thirty dollars, payable to one Robert W. Cox; said Keiser died on the twenty-fifth of August, 1878, before the maturity of the said note.' On the thirtieth of June, 1879, the said land was sold in mass at public auction in front of the court-house door in Lexington, for twenty-two hundred and eleven dollars to the defendants, who received a deed therefor from the said trustee. On the nineteenth of July, 1882, this suit was begun in the circuit court of Lafayette county, to set aside said sale and cancel said deed, first, on the ground that the land being in two parcels, was sold in mass, when it would have brought more had it been sold separately; second, that one Robert A. Hill, who was a competing bidder at said sale, was induced to refrain from bidding at the sale, by the persuasion and promise of defendant, Wm. T. Gammon, to pay him five hundred dollars if he would not bid against him. The grounds relied upon in the petition to set aside the sale were specifically denied in the answer, and at the April term, 1883, of the Lafayette circuit court, a trial of said cause was had which resulted in a mistrial, whereupon the venue of the cause, at the instance of the defendants, was changed to the circuit court of Saline county, where, at its October term, 1883, the following issues were framed and submitted to the jury, who found as follows:

"1. Was the land sold to Tutt, as trustee to defendants, of greater reasonable cash value at the time of such sale than twenty-two hundred and eleven dollars; and if so state what their reasonable cash value was at that time? A. Yes—$3,088.44."

"2. Would the land have sold for more money, if sold in parcels, than sold in a body? if so, how much more in your opinion? A. It is the opinion of the jury it would not."

"3. Did said trustee, Tutt, negotiate or aid in procuring a loan for defendants, or either of them, to be used in buying this land? If so, did said Tutt have knowledge or information that such money was to be so used? A. It is the opinion of the jury he did."

"4. Did defendant, William T. Gammon, by any means prevent Robert A. H. Hill from bidding, or by persuasion, entreaty, or offer, or promise of compensation, induce said Hill not to bid on said land at said sale? If so, state what means were so used, or offers, or promise of compensation, and state whether said Hill would have bid on said land more than Gammon's bid, and how much more? A. We, the jury, believe that the said Robert A. H. Hill was, by persuasion or otherwise, stopped from bidding by Gammon. We think said Hill would have bid more, how much more we cannot say."

"5. You will find and state the fair rental value of the land since defendants have been in possession, and also the fair value of the *permanent improvements*, if any, put upon said lands by defendants. A. We find total value of rents to be $1,531.27. We find total value of *permanent improvements* to be $1,827.04."

"6. If any of the plaintiffs knew of the defendants' putting valuable and lasting improvements upon the lands, state when they so knew it or learned it, and which of plaintiffs so knew it; and whether the party so knowing it, at the same time knew of any of the alleged fraudulent acts of Gammon in the matter of the purchase; and if so, whether such person gave notice to Gammon at the time of the claim that his title was not good or that it would be contested. A. We find that Mrs. Burnside, Effie, Virgie, and Forest Keiser, all knew of improvements being made in the winter of 1879 and 1880. We don't think they knew of any of the alleged frauds of Gammon at that time."

The court adopted the findings and entered a decree setting aside the sale, and defendants appealed.

Keiser v. Gammon.

On the trial, defendants offered in evidence a deed showing that about seventeen months before the sale in question was made, that the land in controversy sold under a prior deed of trust for thirteen hundred and ninety-six dollars ; and also a deed showing that in the same month defendants bought the said land, it sold at private sale for sixteen hundred dollars, and that sixteen months before defendants purchased the land at said sale, the ancestor of plaintiffs bought it for seventeen hundred and seventy-one dollars ; and in connection therewith the evidence of three witnesses was offered to the effect that since said sales, up to July, 1879, there had been no increase in the value of the land. This evidence the court refused to receive, and its action in that respect is insisted upon as being erroneous. Ordinarily, it may be said that the price for which a thing actually sells in the market may be taken as evidence of its value, and that the evidence offered was admissible as bearing upon the question of value we think is established by the following authorities : *State to use v. Scholl*, 47 Mo. 84 ; *Thornton v. Campton*, 18 N. H. 20 ; *Benham v. Dunbar*, 103 Mass. 365 ; *Croak v. Owens*, 121 Mass. 28 ; *Brigham v. Evans*, 113 Mass. 538 ; *Kent v. Whitney*, 9 Allen 63.

It is next insisted that the decree is not sustained by the evidence, and we are asked to review it, as it is our province in chancery causes to do. *Morey v. Staley*, 54 Mo. 419. Plaintiffs seek to set aside the sale and deed on two distinct grounds : first, because the land was sold in mass ; second, because one R. A. Hill was induced not to bid at the sale by the persuasion and promise of defendant, Wm. T. Gammon, as alleged in the petition, to pay him five hundred dollars if he would not bid against him. As to the first ground relied upon, it may be said that, of the number of witnesses examined as to whether the sale of the land in mass was prejudicial to the owners, there is a preponderance of evidence to the effect that such method of sale was not

prejudicial. As to the second ground, it may be said that no principle is more firmly settled in equity jurisprudence than that a purchaser, either at a judicial sale or at such a sale as the one in question, who is guilty of any fraud, trick, or device, the object of which is to get the property at less than its value, and succeeds in doing so, will not be permitted to enjoy the fruits of his purchase on that ground, and the fact is made so to appear.

In such cases, the burden of showing the fraud is upon the party attacking the sale and deed, and to justify a cancellation of the deed, the evidence adduced to establish the fraud must be clear and convincing. *Forrester v. Scoville*, 51 Mo. 268 ; *Jackson v. Wood*, 88 Mo. 77 ; *McNew v. Booth*, 42 Mo. 192 ; *Kennedy v. Kennedy*, 57 Mo. 76 ; *Forester v. Moore*, 77 Mo. 651.

Robert A. Hill was the only witness introduced by plaintiffs to establish the fraud alleged, and in his testimony stated as follows : " I was at the sale of the land ; I had agreed with Creasy to buy it ; Gammon was at the sale ; Judge Tutt bid, Frank Tutt bid once, and I myself bid ; did not see any one else bid ; after we had bid some time, Gammon called me, and took me back in the courthouse, and said I ought not to bid against him ; I asked him why ; he said I had enough land ; I said I had not enough money ; I went back and began bidding on the land ; he called me again, and we went back the second time ; I proposed to buy the land with him ; he said we ought not to do that, and said if I would not bid against him, he would make it all right with me ; I then said all right, and we went back, and I did not bid any more and told the auctioneer I was done, and the land was knocked off on Judge Tutt's bid ; I learned from Gammon that Judge Tutt was bidding for him ; I went to see Gammon that evening after the sale, but did not see him ; I asked him several weeks afterward what he was going to give me, and he said nothing ; I said

'You promised to give me something,' and he said, 'If you had bid ten dollars more, you would have got the place'; I said, 'I would if you had not fooled me;' I would have bid twenty dollars an acre for the one hundred and sixty acres had not Gammon induced me to quit bidding; I would have bid thirty-two hundred dollars for the one hundred and sixty acres had not Gammon induced me to quit bidding; the land was sold in bulk as two hundred acres."

On cross-examination, for the purpose of impeachment, he was asked the following questions: Q. No. 1. "State whether or not, at the town of Odessa, in Lafayette county, Missouri, about six weeks after said trustee's sale, at which said Gammon bought the said land in question, did you not, in a conversation with 'Squire Robert T. Russell, tell him that said William T. Gammon was to give you, or that you were to get, or expected to get, of said Gammon, two hundred dollars, by an agreement with him not to bid on the farm (meaning the lands involved in this suit), and 'If he does not do it, I will squeal on him,' or words in substance to that effect?" A. "Have no recollection of any such conversation; had no conversation with him until after this suit was brought; did not tell Russell I was to get two hundred dollars."

Q. No. 2. "Did you or not, on the road near Bates City, in Lafayette county, a short time after the date of said sale, in conversation with Robert Sanders, say to him that Gammon had agreed that if you would not bid on said land against him, he would let you and Sam. Creasy have an interest in the farm, and that afterwards Gammon refused to let you and Creasy have such share; and that it was damned uncertain whether Gammon would hold the farm, or words in substance to that effect?" A. "Know Robert Sanders; had a conversation with him in Bates City; don't recollect any such

conversation with him; don't remember anything said about Creasy in that conversation; don't recollect the conversation to be as stated in the question; I talked with Sanders about the sale."

Q. No. 3. "During the summer of 1880, did you say, in a conversation had with one Benjamin Hammer, your brother-in-law, either in Lexington, or about half way on the road between Lexington and Texas Prairie, that said lands had been sold by an order of the probate court (of which said Gammon was judge), and that Gammon, not being allowed to bid at said sale, employed some person to bid for him, and that Gammon agreed with you that if you would not bid at said sale, he would take you and Sam. Creasy in as partners, or give you and said Creasy an interest in the land, and that Gammon afterwards refused to do so, and that you had a damned good notion to sue him or have a suit brought against him to take the land away from him, or words in substance to that effect?" A. "Know Ben. Hammer; had no such conversation."

Q. No. 4. "During May or June of 1882, when you and one Michael Strader were driving cattle in the public road by the land in this suit, upon said Strader's remarking to you that said Gammon had a pretty place, then did you not answer, 'Yes, and if it had not been for that damned old rascal (meaning defendant Gammon), I would have had an interest in it,' or words in substance to that effect." A. "Know Michael Strader; don't recollect any such conversation; know I did not use any such language; I remember driving cattle and likely talked to Strader, but did not tell him what is stated in the question; I have no interest in this suit."

Q. No. 5. "In a conversation you had with Alfred Ferguson and Jonas T. Ferguson, in the fall of the year 1880, and about the time of sowing wheat, sitting on or by the fence of stock-pens of the Chicago & Alton railroad at Bates City, in Lafayette county, Missouri, did

you not say you would spend a thousand dollars of your own money to dispossess W. T. Gammon of the farm he had purchased, known as the Keiser farm?" A. "Know Alfred and Jonas T. Ferguson, and I talked with them, but not about the land at the stock-pens at Bates City; did not have any such conversation; did not say to them I'd spend a thousand dollars to dispossess Gammon; don't think I met the old man; I met Jonas at Bates City."

Q. No. 6. "Did you not, shortly after the trustee's sale to Gammon, meet Nelson Rickstrew about one and a half miles northeast of your place in Lafayette county, Missouri, on the public Greenton road, near the place known as the Dr. Hughes place, upon which widow Roberts lives, and in a conversation with him about the sale, tell him that you went down to bid on the farm; that you did not know how so many found out that you wanted to bid; but that you did not get the place because Gammon bid more for it than you were willing to pay for it, or words in substance to that effect?" A. "Know Nelson Rickstrew, but never had any such conversation with him; I never spoke to the man on earth about the matter; I had a conversation with Sanders; he was in favor of Gammon, and I was opposed to him; I spoke of the land; I said that Gammon had beat me, or the Keiser heirs, out of the land; I have nothing to do with bringing this suit, and did not know it was to be brought until it was brought; the land I spoke of buying in partnership was eight hundred acres sold at partition; I was one of the heirs; I live on part of the land; it was bought in my name by agreement; part of it was afterwards sold at a profit, and the money divided among the other heirs and myself; I bought the interest of the other heirs in the rest."

Defendants, for the purpose of contradicting Hill, put in the following evidence: Robert T. Russell testified: "I live in Lafayette county; I have several occupations; deal in real estate principally; farm a little;

am vice-president of Farmers' Bank at Odessa, and I am a magistrate; I know Robert A. H. Hill."

(Here defendants put the same question that was put to said Hill, and numbered question one in his cross-examination, and the witness, in response, answered): A. "Yes, sir, that was the impression he left with me; that he expected to be remunerated about two hundred dollars; this was six weeks after the sale."

CROSS-EXAMINED. "I was at the sale and saw Hill, Gammon, and Tutt there; I saw Hill and Gammon together go back into the hall of the courthouse; he did not say he was to get two hundred dollars for not bidding, but that was my understanding, he was to be remunerated."

Robert Saunders testified: "I live in Lafayette county, Missouri; know R. A. H. Hill."

(Here defendants put the same question to the witness as was put to said Hill, and numbered question two in his cross-examination, and witness, in response, answered as follows): A. "Yes, sir." And witness further testified: "I know the place in suit; know Gammon put some improvements on it; a new plank fence in front and also around the lots and yard; don't know how much fence he put up."

CROSS-EXAMINED. "The conversation with Hill took place in the road between my house and Bates City, a very short while after the sale; the conversation was that Gammon agreed to divide with him (Hill) and Creasy; he told me this was to keep him (Hill) from bidding and that he quit bidding because Gammon made the promise, as I understood it; he told this further on in the conversation."

Benjamin Hammer testified: "I live near Wellington, Lafayette county; have known Hill since 1880."

(Here defendants put the same question that was put to said Hill, and numbered question three in his

cross-examination, and witness, in response, answered):
A. "A part of that did not occur; he said he had proposed
to Creasy to go in partnership and buy the land, and
that he (Hill) was to do the bidding for both, and he
went there and bid on the land, and Gammon came to
him and told him he didn't want him to bid on the land
for speculation; that he (Gammon) wanted it for a home,
and that if he (Hill) would not bid against him, Gammon
would divide with Hill; that Gammon was probate judge
and could not bid on the land himself, and he had to get
some one else to bid for him, and Hill said he had a good
mind to bring a suit against him to set the sale aside."

Michael Strader testified: "I live in Lafayette
county, Missouri; know Robert A. H. Hill."

(Here defendants put to witness the same question
put to said Hill, and numbered four in Hill's cross-
examination, and witness, in response, answered as fol-
lows): A. "I went with Hill to help drive some cattle;
part of the conversation occurred and part not; Hill said if
it had not been for the damned old rascal I would have
owned the place or an interest in it; had heard Hill say
before that he had been at that sale; I reckon the con-
versation occurred in 1882; Hill said, 'if it had not been
for that damned old rascal Gammon, I would have had
that land or an interest in it'; that was all that was said
at that time."

Jonas T. Ferguson testified: "I live in Lafayette
county, Missouri; have known Hill ten years."

(Here defendants put the same question that was
put to said Hill, and numbered question five in his
cross-examination, and witness in response answered as
follows): A. "Yes, sir; Hill said that; my father,
Alfred Ferguson, was present."

CROSS-EXAMINED. "He never spent one thousand
dollars to my knowledge."

Alfred Ferguson testified: "I live in Lafayette
county, Missouri; know Robert A. H. Hill."

(Here defendants put to the witness the same question that was put to said Hill, and numbered question five in his cross-examination, and witness, in response, answered as follows): A. "Yes, sir; he did; it was in September, 1880, I think."

CROSS-EXAMINED. "I am the father of the last witness, Jonas Ferguson."

Nelson Rickstrew testified: "I live in Odessa, Lafayette county, Missouri, and know Robert A. H. Hill."

(Here defendants put to witness the same question put to said Robert A. H. Hill, and numbered six in his cross-examination, and witness, in response, answered as follows): A. "Yes, sir; that is what he said."

CROSS-EXAMINED. "Hill said he was at the sale and went there to buy the land."

The evidence of Hill is flatly contradicted by that of Gammon, who testified as follows: "We (alluding to his wife) made up our minds to buy a home, and concluded to buy this farm; I went to work to investigate the title, and found I would not have time, and employed Frank Tutt to investigate it and bid for me; I went to the sale and saw some bidding going on by one or two parties; Hill and others bidding; I was standing in the door of the courthouse; Mr. Hill came by me and said he wanted to have a talk with me; we went into the collector's office; he said no one else was bidding on the land, and said let us go into partnership; I told him it would not be right; he came out, and went to bidding; he bid several times and took me back again and said he would bid against me if I did not go in with him; I told him I would not do it; he took me back the third time, and again I said it was not right, and he came back; I thought he was going to bid again; he did not bid again; there seemed to be some doubt whether my bid was last; the bid stood some time at twenty-two hundred and ten dollars; I

nodded to Frank Tutt to go on, and my bid through Tutt was the last, and it was knocked off to me at twenty-two hundred and eleven dollars ; Judge Tutt made no bid for me. In October, after the sale, while I was holding probate court, Hill came and beckoned to me and claimed that I had promised to pay him some money not to bid ; I told him, 'You know I did not do any such thing ; I told you it was wrong ;' he said I told him that twice, but not the last time, and said, 'Yes, I see,' and left without saying any more." The evidence of Gammon as to his having been asked back into the courthouse by Hill is corroborated by one witness, and his evidence as to Frank Tutt having bid in the land for him is fully corroborated by Tutt.

It was shown by the evidence of three or more witnesses that Gammon called or beckoned Hill, and that they went twice, and, perhaps, three times, back into the courthouse. As to what occurred between Gammon and Hill with reference to the latter not bidding against Gammon at the sale, no corroboration of the story told either by Hill or Gammon as to what took place between them is to be found in the record. Hill in his evidence admits that, in one of the interviews, he proposed to buy the land in partnership with Gammon and that Gammon declined the proposition, and in this respect and to the above extent, corroborates the evidence of Gammon, but in all other respects the evidence of one contradicts that of the other.

In view of the rule hereinbefore stated, that the burden of showing the fraud, as charged in the petition, in Gammon's purchase, is on the plaintiff, and that the evidence to establish it must be clear and convincing, and in view of the evidence introduced bearing on that question, we are of the opinion that it does not justify the decree rendered and the case made in the petition must fail for want of proof.

This view of the case renders it unnecessary to

discuss the evidence in regard to the value of the land at the time of the sale further than to say, that, according to the evidence of Longdon, he bid at the sale two thousand dollars for the land, which was all in his judgment that it was worth ; and in view of the evidence offered and improperly rejected, and which we may consider as if it had been received, that the land had been sold three times for less than two thousand dollars, a short time before the sale in question ; and in view of what a majority of the witnesses testified as to its value, placing it at twelve and thirteen dollars per acre ; in view of these things, and the fact that, although the land was described in the deed of trust as being two hundred acres, more or less, that there was in fact only about one hundred and eighty-six acres of it, and the further fact that the fences were in a dilapidated condition, the houses greatly out of repair, the front windows being nailed up with boards, we are unwilling to say that the price of twenty-two hundred and eleven dollars paid for it is so inadequate as to excite a suspicion of fraud in its purchase.

For the reason above given, the judgment will be reversed, in which all concur.